UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID S. ENGLISH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:11-cv-0347 |
| v. | ) | |
| | ) | |
| GENERAL DYNAMICS | ) | JUDGE SHARP |
| INFORMATION TECHNOLOGY | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

For a man named Mr. Rogers, James Rogers was particularly unneighborly. Cranky, foul-mouthed, and abusive to coworkers, this aging white custodian was particularly hard to get along with for many of the 30 months he and Plaintiff David English, an African-American man, worked together. And yet, he made others' lives miserable too, as evidenced by the multiple warnings he received from supervisors to improve his gruff demeanor and negative attitude toward coworkers. Because Rogers' rude behavior cannot be shown to depend on the color of his beleaguered colleagues' skin, and because Plaintiff has not established that Defendant General Dynamics Information Technology, Inc. ("GDIT"), should be held liable for his conduct, English's Title VII hostile work environment claim against GDIT must fail. And because English has not produced evidence that he was retaliated against after complaining about racial discrimination, his Title VII retaliation claim must fail as well. This Mr. Rogers was certainly Mr. Bad Example, but there is no evidence that his rude and aggressive conduct was race-based; as such, GDIT cannot be held liable for it. Nor can GDIT be held liable for retaliating against an employee who had not alleged discrimination.

1

# **FACTS**[1]

Plaintiff David S. English, an African-American male, began working for GDIT in December 2007 as a janitor/groundskeeper. In this job, he performed groundskeeping, maintenance, and cleaning duties at Fort Campbell under the terms of a contract between GDIT and the United States Army. At the time of his hiring, the only other GDIT employee in the janitor/groundskeeper position was James Rogers, a white male who had held the position for a number of years. Although Plaintiff and Rogers were peers who reported to the same supervisor, Rogers participated in Plaintiff's pre-employment interview and assisted him with learning his job duties and responsibilities.

From the beginning, their relationship was characterized by conflict. Plaintiff believed Rogers had a "chip on his shoulder" and was "somewhat disgruntled," in part, Plaintiff suspected, because Rogers felt threatened by a new employee (Plaintiff) who was hired to reduce Rogers' workload. Within the first five days of Plaintiff's employment, Rogers began yelling at him and treating him disrespectfully on the job. Plaintiff felt that Rogers was trying to be his boss, screaming "negative stuff" at him daily, such as "Get your A over here," telling him, "[K]iss my ass," and calling him names such as "motherfucker." On four or five occasions, Rogers slammed a door in Plaintiff's presence. This disparaging treatment continued, on and off, throughout the two-and-a-half years Plaintiff and Rogers worked together. At times their altercations turned physical. On one occasion in 2008, Rogers struck Plaintiff across the back with a folded cardboard box, in the presence of their supervisor, David Dotson. On another occasion, Rogers threw a set of

---

[1] Unless otherwise noted, all facts are drawn from Defendant's Statement of Undisputed Facts (Docket Entry No. 29), the related exhibits, and Plaintiff's responses thereto (Docket Entry Nos. 48 & 49). Although facts are taken from submissions made by both parties, on a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

keys toward Plaintiff in a manner Plaintiff deemed disdainful. On another occasion, Rogers threw a mouse pad in Plaintiff's direction, knocking over items on his desk. On still another occasion, Rogers threatened him with a pocketknife on the job site.

Rogers never used a racial epithet or called Plaintiff any racially derogatory names, but he did make one comment to Plaintiff that expressed racial hostility. In a conversation not long after Plaintiff met Rogers' family at an event on the base, Plaintiff told Rogers, "Man, you've got a nice looking family, nice looking." Rogers replied by saying that he would kill any black man or Mexican who "got with" his daughter. Plaintiff felt disrespected by Rogers but did not report his comment to supervisors.

The recurring conflicts between Plaintiff and Rogers led to a series of conversations, emails, and meetings with supervisors about the two men's workplace relationship. The first such meeting occurred in January 2008, soon after Plaintiff had begun working. At that meeting, which was held with Plaintiff, Rogers, and Dotson, and at meetings in February and March 2008, Plaintiff complained about Rogers' hostility toward him. At one meeting, the timing of which is disputed, Rogers responded that Plaintiff was lazy and would not wear clothing appropriate for dirty jobs.[2] Dotson let the men air their grievances for more than an hour, then reminded them that they needed to attempt to work together, that they were peers, and that both of them reported to Dotson. According to Plaintiff, Rogers' conduct only grew bolder after these counseling sessions, but from management's perspective, a period of relative tranquility ensued.

---

[2] Defendant produced an affidavit from Dotson and his signed April 16, 2009, memorandum purporting to document the meeting, while Plaintiff, in an affidavit, asserts that a meeting of these parties did not occur in April 2009. Plaintiff cites portions of the record that deny the substance of Rogers' statements, but other than disputing the date, he provides no support for the proposition that the meeting did not occur as described by Defendant. (Docket Entry No. 49, at 5-6.) For purposes of this motion, the Court considers the substance of the meeting undisputed and the timing in favor of Plaintiff. *See* Fed. R. Civ. P. 56(e).

Still, by August 2009, problems had bubbled to the surface once again. First, Plaintiff told Dotson that he would not tolerate any more "harassment" from Rogers. Then in September 2009, he reported Rogers' conduct to Tom Green, the GDIT site manager. On September 11, Green counseled Rogers that he should stop working overtime that was not recorded on his timesheets. Not long after that, on November 11, 2009, Rogers was counseled by Dotson for his negative attitude and "unruly approach to people" in the workplace, and the manner in which he tended to "growl" at them. Dotson told Rogers to change his attitude and be more personable and less gruff with his co-workers.

On November 20, 2009, Rogers reported Plaintiff for working unrecorded overtime, the same infraction he had been counseled about months before. Plaintiff confronted Rogers about what Plaintiff believed was Rogers' false report, and he met with Green to discuss the situation. (Plaintiff's immediate supervisor, Dotson, was on leave.) Green, concerned that Plaintiff had been working unreported overtime, sent him home early to avoid any chance of him incurring unpaid overtime. He advised Plaintiff to put his concerns about Rogers in writing, which Plaintiff did in the form of a November 23 email to Green, on which were copied Dotson and Marcia Ferguson, the site secretary and administrative contact. In the email and a subsequent conversation with Green, Plaintiff complained that Rogers used profanity, yelled, and was loud. At no time did he mention any concerns that Rogers' behavior was racially motivated.

On November 30, 2009, Dotson returned from leave and counseled Plaintiff about working unrecorded overtime. Dotson formalized the counseling in a written Employee Counseling Report, which he presented to Plaintiff on December 2. Plaintiff refused to sign the report because it contained the false statement that he had constantly been told

not to stand around when there is work to be done. Plaintiff contacted Sandra Brayman, the off-site human resources manager for his division, to advise her that he did not get along with Rogers, that Rogers had a temper, and that his actions were discriminatory. Plaintiff told her about Rogers striking him with a cardboard box and throwing a mouse pad at him. In the days that followed, Brayman conducted an investigation, interviewing Rogers and Dotson, both of whom confirmed the recurring conflict between Plaintiff and Rogers. Dotson informed Brayman of a recent reorganization of the two men's work assignments that reduced their interactions by putting each one in charge of a different part of the building. Brayman interviewed other witnesses identified by Plaintiff, ultimately concluding that the two men's dispute arose from a strained working relationship. She recommended the supervisors sit down with the two employees again to help them figure out how to get along with one another.

On December 3, 2009, the day after Plaintiff contacted Brayman about Rogers, he filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging a racially hostile work environment and retaliation—in the form of the written Counseling Report he had received the day before—for complaining about Rogers' conduct. Given Plaintiff's concerns, Green convened a "Team Performance Dialogue" on December 14, at which Plaintiff used the word "discrimination" in front of Rogers, Green, Dotson, and Ferguson to describe Rogers' attitude toward him. During this meeting, Rogers' breathing grew heavy and his face grew red, but he said he would give Plaintiff a written apology. At that point, Green stated that he did not believe Plaintiff's allegations about Rogers, and Dotson instructed Rogers not to provide an apology. Plaintiff never received an apology.

In February and April 2010, Plaintiff reported Rogers for using profanity and then for throwing lawnmower keys at him in anger. On April 28, 2010, Green issued Rogers a "Final Written Warning" instructing him that his "continued inappropriate behavior"—specifically, being argumentative and using profanity—had put his job in jeopardy if he did not show immediate and sustained improvement in those areas. On May 29, 2010, due to what GDIT called a reduction in funding, Rogers was terminated.

Meanwhile, in May 2010, Plaintiff received a pay raise. However, in July, he called a company hotline to report what he felt were acts of retaliation by his supervisors due to his pending EEOC complaint. He alleged that they were micromanaging him, overloading his work, tampering with his computer, and generally trying to set him up for failure. In his deposition, Plaintiff cited an incident in which four restrooms in the facility were "completely trashed" immediately after he had cleaned them. In August 2010, Plaintiff received written reprimands for failing to leave the facility 15 minutes after he had finished working, as company policy requires. In December 2010, his EEOC complaint was dismissed. In May 2011, while this lawsuit was pending, Plaintiff was terminated when his position was eliminated.

## LEGAL STANDARD

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is

disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Before turning to the merits, the Court notes that Plaintiff, in his Response to Defendant's Statement of Undisputed Facts, fails to comply with Fed. R. Civ. P. 56 and Rule 56.01(c), Local Rules of Court, by either agreeing that each fact is undisputed (wholly or for the purpose of summary judgment) or demonstrating that it is disputed and citing to the record accordingly. (*See* Docket Entry No. 49.) Rather than agreeing to or disputing each fact, Plaintiff sometimes "admits" or qualifies an assertion of fact by acknowledging that it portrays the declarations accurately, and then providing further facts that do not necessarily contradict the fact asserted by Defendant. *See, e.g., id.* at ¶¶ 16, 32, 37.

The Court is under no obligation to search the record *sua sponte* for genuine issues of material fact and may consider an improperly supported or addressed assertion of fact as undisputed. Fed. R. Civ. P. 56(e); *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (noting that the trial court has no duty "to search the entire record to establish that it is bereft of a genuine issue of material fact") (internal quotation marks omitted). Nonetheless, in an effort to do justice expeditiously and minimize the damage done to the litigant's case by any shortcomings in his filings, the Court has attempted to find support in the record for Plaintiff's claims of material issues for trial. However, because Plaintiff's claims fail as a matter of law even if every one of his allegations are true, the Court will rule on Defendant's motion in spite of Plaintiff's noncompliance with the Local Rules. *See* Fed. R. Civ. P. 56(e)(3).

Plaintiff makes two claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, one alleging that GDIT is liable for the existence of a hostile work environment based on racial harassment, and the other alleging that GDIT retaliated against him after he submitted a written grievance to company management. The Court considers each claim in turn.

### I. Plaintiff's Hostile Work Environment Claim

Defendant asserts that Plaintiff's hostile work environment claim fails as a matter of law for several reasons. First, it argues that Rogers' conduct was not severe or pervasive enough to alter the terms and conditions of Plaintiff's employment. Defendant contends that most of Rogers' objectionable conduct was race-neutral and thus only the explicitly racial comment about a black or Mexican "getting with" his daughter can be considered as part of a racial harassment claim. Defendant further claims that the purported hostile work environment did not interfere with Plaintiff's performance of his job duties. Finally, Defendant argues that it cannot be held vicariously liable for Rogers' conduct because it did not know, nor should it have known,

about the purported racial harassment. When it was notified of the uncomfortable work situation between the two men, it took prompt corrective action, Defendant argues, but supervisors did not learn of the racial nature of Plaintiff's complaint until receiving notice of the December 3, 2009, EEOC filing.[3]

Plaintiff argues that the harassment he experienced in this case is analogous to that of the plaintiff in *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999). There, the Sixth Circuit, sitting en banc, held that "harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement." *Id.* at 565. In other words, if a course of severe or pervasive harassing conduct, not explicitly based on protected class status, demonstrates unequal treatment that would not occur but for the employee's membership in the protected class, it creates an inference that discrimination motivated the conduct. *Id.* at 565-66. Analogizing his case to *Williams*, Plaintiff argues that Rogers' rude treatment of Plaintiff was "based on race" and should survive summary judgment. *See id.* Furthermore, he argues, the conduct inhibited his ability to perform his job because "he could not turn his back on Rogers for fear that [Rogers] would assault him yet again," thus altering the terms and conditions of his employment. (Docket Entry No. 48, at 17.) Finally, Plaintiff contends the meetings GDIT held to address Plaintiff's complaints about Rogers' harassing behavior did nothing in fact to correct the behavior.

In order to establish a hostile work environment claim, Plaintiff must demonstrate that: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of altering the terms and conditions of Plaintiff's employment by creating a hostile work environment; and (5) the

---

[3] For purposes of summary judgment, the Court credits Plaintiff's assertion that he mentioned "discrimination" to a GDIT manager on December 2, 2009.

employer failed to take reasonable care to prevent and correct any harassing behavior. *Russell v. University of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008). A court should consider all the circumstances rather than dividing and categorizing the reported incidents, but "only harassment *based on the plaintiff's race* may be considered." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (emphasis in original). To prove that harassment was based on race, Plaintiff must either provide direct evidence of the use of race-specific, derogatory terms or comparative evidence about how the harasser treated members of both races in the workplace. *Id.* "Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (citation omitted).

Plaintiff contends that Rogers' angry and abusive treatment of him—cursing, yelling, slamming doors, throwing a mouse pad at him, throwing keys at him, hitting him with folded cardboard boxes, pulling a pocketknife on him, and reporting him for working unreported overtime—was race-based because it would not have occurred but for the fact that Plaintiff is black and Rogers white. To support this claim, Plaintiff testifies that Rogers made an offensive, race-based statement to him that he would "kill any black man or Mexican who got with his daughter." Other than that single offensive statement, he offers no evidence of racial animus beyond his own supposition that Rogers' conduct was motivated by race "because [English] was black and Mr. Rogers was white and the Plaintiff did not see Mr. Rogers treat any other person in this manner." (Docket Entry No. 48, at 8.)

However, undisputed evidence in the record belies Plaintiff's assertion that Rogers did not treat anyone else the way he treated Plaintiff. Plaintiff himself testified at his deposition that

10

he heard Rogers tell another GDIT employee to "kiss his [ass]." (Docket Entry No. 51-1, at 27.) The man even commented on it to Plaintiff, saying, "What's wrong with him? You know, he's got an attitude." *Id.* At another time, Rogers "vented some anger" and raised his voice in a meeting with Dotson, prompting Plaintiff to notice that Rogers and Dotson "had issues" between them, too. *Id.* at 107, 110. Rogers was "disgruntled" and "always had a chip on his shoulder," according to Plaintiff, and displayed this attitude to "a couple of other folks" in addition to Plaintiff. *Id.* at 109. Finally, Rogers was counseled by his supervisors for his "unruly approach to people in general" and the way he "continues to 'growl' at people." (Docket Entry No. 32-2.) Given the evidence that Rogers treated many people rudely, then, Plaintiff's subjective belief that Rogers was rude and abusive only to him due to racial animus is entitled to little weight. *See Perkins v. Harvey*, 368 Fed.Appx 640, 646 (6th Cir. 2010) (per curiam) (declining to find a hostile work environment where Plaintiff's "pure supposition" is all that links a series of "garden-variety personality conflicts" to racial animosity); *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 434 n.5 (noting that conclusory allegations and subjective perceptions are insufficient to stave off summary judgment) (quoting *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001)). It could well be that Plaintiff got a larger dose of Rogers' bad attitude than did others—as the only two janitors in this facility, they worked together frequently (Docket Entry No. 51-1, at 28)—but to the extent his claim is based on Plaintiff's perception that Rogers did not treat whites rudely, it has no merit.

Still, it is possible that while Rogers treated everyone badly, his conduct toward Plaintiff was especially abusive, and the heightened level of abuse was caused by racial animus. However, Plaintiff has produced no evidence to support an inference of racial animus that could distinguish Rogers' treatment of Plaintiff from his treatment of everyone else. It is well settled

that a single offensive discriminatory remark, particularly one made by a coworker who lacks managerial authority, is insufficient to implicate Title VII. *Ferguson v. Snow*, 185 F. App'x 456, 463 (6th Cir. 2006) (citing *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002) (internal citations omitted)). And while one must look at the totality of the circumstances to determine what conduct is race-based for the purposes of a hostile-work-environment analysis, the Court cannot impute a racial motive to all of Rogers' seemingly in-character conduct based on one racially charged statement about African-Americans and Mexicans. Absent more evidence, a decision to view all Rogers' actions through a prism of racial animus runs the risk of converting Title VII into a code of workplace civility. *See Williams v. CSX*, 643 F. 3d at 512-13 (limiting hostile workplace analysis to explicitly racist statements where Plaintiff lacked sufficient comparative evidence to establish that other adverse treatment was based on race).

The lone case Plaintiff cites to bolster his claim that Rogers' mistreatment of him was based on race, *Williams v. GM*, is readily distinguishable. There, the plaintiff's supervisor made lewd sexual comments about her breasts, put his arm around her neck and placed his face against hers, made multiple statements filled with sexual innuendo, and commented on her while she was bent over. *Williams v. GM*, 187 F.3d at 563. Additionally, a co-worker said "Hey, slut" and commented that he was "sick and tired of these fucking women." *Id.* In that context, the Court reasoned, non-sexual pranks including finding office supplies glued to one's desk, being hit by a thrown box, and being locked in one's work area still constitute acts of harassment "based on sex" because they are part and parcel of a demonstrated pattern of sexual hostility. *Id.* at 563-64. Unfortunately for Plaintiff, this logic does not work in reverse. Where the *Williams* court identified a demonstrated pattern of sexual hostility and projected it onto a few instances of facially non-sexist conduct, Plaintiff attempts to graft one instance of racial hostility onto a

pattern of facially non-racist conduct. That stretches the analysis beyond the breaking point. Absent any other evidence of a racial motive for otherwise race-neutral conduct, the Court cannot extrapolate a pattern of race-based harassment based on one comment.

When only harassment "based on the plaintiff's race" is considered, *see Williams v. CSX*, 643 F.3d at 511, Plaintiff cannot demonstrate that the conduct was sufficiently "severe or pervasive" to alter the terms and conditions of his employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Russell*, 537 F.3d at 608. "All the circumstances" are to be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp*, 536 U.S. at 117. Based on those factors, one racially offensive comment could not be said to alter the terms and conditions of Plaintiff's employment. *Id.* at 115 (hostile work environment claims "involve[] repeated conduct"); *see Barrett*, 556 F.3d at 515. Had Plaintiff established that all of Rogers' angry conduct toward him was racially motivated, it would be a closer call: the frequency and severity of Rogers' bullying, coupled with the humiliation and physical threats endured by Plaintiff, tilt the analysis of the conduct further toward "severe or pervasive." On the other hand, Plaintiff himself stated that Rogers' actions did not interfere with his work performance, which militates against any finding that it altered the terms and conditions of his employment. (*See* Docket Entry No. 51-1, at 35.) The Court need not resolve that question, though, because Plaintiff has not established that any of Rogers' angry conduct was based on race.

Finally, Plaintiff has failed to prove that Defendant GDIT failed to take reasonable care to prevent and correct any harassing behavior. *See Russell*, 537 F.3d at 608. Plaintiff argues that although "several meetings were held in the first three months of the Plaintiff's employment,"

13

purportedly to address Rogers' behavior toward Plaintiff, "nothing was ever discussed regarding the harassment by Mr. Rogers of the Plaintiff." (Docket Entry No. 48, at 18.) This assertion is contradicted by his own contemporaneously filed response (unsupported by any citation to the record) to one of Defendant's undisputed facts. (*See* Docket Entry No. 49, at 7 (contending that "Mr. English and Mr. Rogers aired their difference for more than an hour" in March 2008).) By Plaintiff's own admission, he did not notify anyone at GDIT that he felt Rogers' poor treatment of him was based on his race until his December 2, 2009, telephone conversation with Sandra Brayman, which took place the day before he filed his charge with the EEOC. (Docket Entry No. 49-1.) Moreover, the record is littered with undisputed evidence that GDIT adopted and distributed equal employment opportunity and harassment policies; repeatedly counseled English and Rogers about their interpersonal conflicts; warned Rogers specifically about the need to treat coworkers with respect; separated the two men to minimize their interactions; took credible steps to investigate English's charge of discrimination; and ultimately, terminated Rogers, the more senior employee, before terminating English. (Docket Entry No. 49, *passim*; *see also* Docket Entries 31-1, 31-2, & 33-2.) No reasonable jury could find that GDIT "knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action." *See Barrett*, 556 F.3d at 516.

Because Plaintiff's hostile work environment claim fails to assert more than one incident of race-based harassment, it fails as a matter of law. Even if all of his coworker's rude conduct were found to be based on race, though, GDIT could not be held liable for it. Accordingly, the Court will grant Defendant's motion for summary judgment with respect to the hostile work environment claim.

## II.     Plaintiff's Retaliation Claim

Defendant moves for summary judgment on Plaintiff's claim of retaliation because (1) the November 23, 2009, email that Plaintiff alleges was the basis for his written reprimand did not constitute protected activity because it did not mention discrimination; (2) Plaintiff has not shown that Dotson, who wrote the reprimand, had any knowledge of the November 23 email; (3) a written reprimand is not a "materially adverse" employment action; (4) Plaintiff has failed to establish a causal link between the protected activity and adverse employment action; and (5) in response to GDIT's assertion of a legitimate, nondiscriminatory reason for reprimanding Plaintiff, Plaintiff has not established that the reason is a pretext for retaliation. Defendant further asserts that Plaintiff cannot base a retaliation claim on the August 2010 bathroom "trashing" episode, the August 2010 written warning he received, or his June 2011 termination because he did not amend his EEOC charge or the complaint in this case to reflect them, and in fact raises these arguments for the first time at summary judgment. Moreover, even if the Court considers these episodes, GDIT alleges that Plaintiff cannot show a causal link between the protected activity and the purported retaliation due the long lapse of time between them.

Plaintiff acknowledges that he did not raise the retaliatory termination claim in his amended complaint but asserts that Defendant "acquiesced" to it because he mentioned his termination in the Initial Case Management Order. Citing case law and the record each once, he argues that GDIT knew Plaintiff was suing GDIT based on racial discrimination, that it subjected Plaintiff to the adverse employment action of termination, and that Plaintiff "has submitted sufficient evidence to raise the inference that his protected activity was the likely reason for the adverse action." (Docket Entry No. 48, at 19.) He says his evaluations began declining only after

15

he filed suit. Plaintiff, noting that GDIT failed to address his termination in its motion for summary judgment, asserts that his termination was merely pretextual.

The Court finds Plaintiff's response to be insufficient. A party may not assert a new legal claim in response to summary judgment. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Tucker v. Union of Needletrades, Indus. and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)). Plaintiff did not amend his complaint to allege retaliatory discharge, nor does he even claim to have exhausted his administrative remedies. While Plaintiff did mention his termination in the Initial Case Management Order, he did not allege that it was retaliatory. (Docket Entry 17 at 2.) Indeed, the fact that GDIT did not address any retaliatory discharge claim in its motion for summary judgment, as Plaintiff points out, only demonstrates what an "unfair surprise" it would be to allow Plaintiff to add this claim in response to a summary judgment motion. *See Tucker*, 407 F.3d at 788. Thus, the retaliatory termination claim is barred as a matter of law.

Plaintiff fails to address any of GDIT's arguments regarding the December 2, 2009, written warning that he claims was retaliatory. To prove retaliation, Plaintiff must show that (1) he engaged in protected activity; (2) GDIT knew that he was engaged in the activity; (3) an adverse employment action was subsequently taken against him; and (4) there was a causal connection between the activity and the adverse employment action. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). The Court finds that GDIT has met its summary judgment burden by showing that Plaintiff's November 23, 2009, email does not constitute "protected activity" because it did not allege race-based discrimination, *see Lockett v. Marsh USA, Inc.*, 354 Fed.Appx. 984, 997; that Plaintiff cannot prove that Dotson knew about Plaintiff's November 23 email (Docket Entry No. 51-1, at 43); and that Plaintiff has no evidence

16

to provide a causal link between the purported protected activity and the adverse employment action (*id.* at 46). Plaintiff "cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968). Because in his responses to the summary judgment and statement of undisputed facts (Docket Entries 48 & 49) Plaintiff has not set forth "specific facts showing that there is a genuine issue for trial" on the retaliation claim, the court will grant Defendant's motion for summary judgment on this claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324.

## **CONCLUSION**

Accordingly, the Court GRANTS Defendant's motion for summary judgment on all claims.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE